# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| WILLIAM H. MILLER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 3:17-CV-831-PPS |
| | ) |
| HARLAN WILLIAMS and LA PORTE | ) |
| COUNTY SHERIFF DEPARTMENT , | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

William Miller claims that excessive force was used against him when he was
injured falling from his bicycle while being pursued by Sergeant Williams of the
LaPorte County Sheriff's Department. Miller has no memory of the precise moments of
his encounter with Williams. As a consequence, there is no evidence that Williams used
excessive force, and therefore, summary judgment must be granted on the federal
claims. But Miller's state claims will be remanded to state court.

## Background

I'll start with the facts conveyed in the light most favorable to Miller. On
November 5, 2015, Miller lived in a house at 1311 Monroe Street in La Porte, Indiana.
[Miller Dep. at 32.] Around 5:00 p.m., Miller rode his bicycle six or seven blocks from
his house or his sister's (which was two houses down), over to his mother's house at 505
Maple Ave. [*Id.*]

After about 45 minutes, Miller came down the stairs of his mother's house and prepared to ride back home when he noticed a Pontiac Grand Prix sitting at a four way stop of a nearby street.  [*Id.* at 32, 38.]  Miller got on his bike and started pedaling home, and in the process he passed the Grand Prix.  [*Id.* at 38-41.]  As he did this he heard someone yell "Bill Miller" or "Bill Miller, hold it right there."  [*Id.* at 41, 46.]  He looked back, and saw four people in an unmarked car and a man with a long beard getting out of the car who began to chase him on foot.  [*Id.* at 41.]  Miller didn't know the people and was scared for his life, so he turned left on Monroe Street and began riding faster, turning into traffic as he rode toward his house.  [*Id.* at 41, 45-46, 52.]

After taking a couple turns, Miller ended up on Clay Street about a block from his house.  [*Id.* at 52.]  As he was peddling on Clay Street, a dark colored SUV came alongside of Miller's bicycle and Miller grabbed the passenger side fender near the headlight with his left hand.  [*Id.* at 52-55, 91.]  What ensued next was some type of accident.  Miller flew from his bicycle and suffered serious injuries to his face and head, but he does not remember the details.  [*Id.* at 58-60; Williams Dep. at 31.]  Miller has a vague recollection of waking up on the steps or sidewalk of his neighbor's house, and he next remembers waking up in the hospital.  [Miller Dep. at 55-60.]

Miller is very clear that he does not recall any collision, or how his injuries actually occurred.  [*Id.* at 56-58, 85-86.]  Based upon his observation that the rear wheel of his bicycle was bent, Miller believes the driver of the SUV must have hit the back tire of his bike.  [*Id.* at 85-86; Ex. E (photographs of the bicycle).]  But he admits this is a

guess — the only thing he really remembers is having his hand on the fender of the SUV, and then waking up in the hospital. [Miller Dep. at 85-86, 89-90.] Miller does not have any eyewitnesses to the event, there is no mention by the parties of a dash camera, and there is not an expert witness to support Miller's theory that the accident was caused by Williams ramming Miller with the undercover police vehicle. [*Id.* at 91-92.]

Let's turn to the officers' point of view. At the time of the incident, Harlan Williams was the commander and supervisor of the La Porte County Metro Narcotics Unit. [Williams Dep. at 4-5.] He and La Porte County Sheriff's Detective Nathan Battleday and La Porte County Deputy Don Hicks were conducting surveillance on Miller's residence because he had been identified by confidential informants and other sources as being involved in dealing narcotics. [*Id.* at 7.] Two unmarked vehicles were used — one was a blue GMC Envoy SUV driven by Williams who was accompanied by Battleday and Hicks. The other was a Pontiac Grand Prix driven by Detective Esparza and accompanied by Detective Robert Allen and state trooper Vicki Maxwell.

During the surveillance of Miller's home, Williams, Battleday and Hicks saw Miller come out of his house around 5:15 p.m., then they moved their vehicle and next saw Miller exit a multi-unit housing structure located at 501 Maple Street which was another house under investigation for drug dealing. [Williams Dep. at 11-12; Battleday Dep. at 10-12; Hicks Dep. at 10-12.] This address is very near Miller's mother's house at 505 Maple, who Miller claimed he was visiting. [Miller Dep. at 30-31, 37-38.] So while Miller says he was leaving his Mom's house, the officers claim he was seen leaving from

3

the house under suspicion for drug dealing. In either event, Williams radioed Detective

Esparza (who was in the other unmarked car) and ordered his unit to conduct a *Terry*

stop of Miller as he rode his bicycle toward them. [Williams Dep. at 15.] Miller rode his

bicycle past the undercover Grand Prix containing Detective Esparza. Williams then

started pursuing Miller in his undercover SUV. [*Id.* at 23, 25.]

The officers have the following account of the chase. Detective Esparza got out

of the Grand Prix and ran after Miller, saying "Police, stop." [Battleday Dep. at 15.]

During the pursuit, the cars were not going very fast. [Hicks Dep. at 24.] Williams

stated, "we were going, obviously, at very low speeds because he was riding a bicycle."

[Williams Dep. at 25.] After Miller turned onto Clay Street, Williams tried to pass and

get in front of Miller so that he could exit the vehicle to stop Miller — he drove around

Miller and angled the SUV to stop at the curb by the intersection of Clay Street and

Ludlow Street. [Williams Dep. at 30-31.] According to Williams, he never drove close

enough to Miller for him to reach out and touch the SUV. [Williams Dep. at 31.] As the

SUV was passing Miller, Detective Battleday, who was riding in the front passenger

seat, saw Miller steer his bicycle away from the vehicle to cut across the corner lot

instead of staying on the road. [Battleday Dep. at 20-21.] According to Battleday,

Miller's bike hit the curb — the bike and Miller flew into the air, then landed on the

sidewalk. [*Id.* at 19-20, 23.] Deputy Hicks, who was in the backseat, also said he saw

Miller turn his bike right, hit the curb, and then fall on his face on the sidewalk. [Hicks

Dep. at 19, 23.] Williams, Battleday, and Hicks all testified there was no contact

4

between Miller, his bike, and the SUV. [Williams Dep. at 31, 49-50; Battleday Dep. at 23; Hicks Dep. at 23.]

To sum up, Miller, on the one hand, has no recollection of how he was thrown from his bike. The officers, on the other hand, uniformly testified that what threw Miller from his bike was his hitting the curb, not him being hit by the SUV.

This case was originally filed in state court. On November 3, 2017, Defendants filed a notice of removal. Miller filed an amended complaint asserting state law claims for assault and negligence (Count I); constitutional violations for excessive force in arresting him under section 1983 (Count II); deliberate indifference by the La Porte County Sheriff's Department (Count III); and requests attorneys fees (Count IV). [DE 33.] Although the amended complaint contained claims against other defendants, they were dismissed pursuant to partial stipulations to dismiss. [DE 44-46.] Defendants La Porte County Sheriff's Department and Sergeant Williams (the driver of the SUV) are the only two remaining defendants, and they have jointly moved for summary judgment on all claims. [DE 54.]

### Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes

summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). However, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citations omitted).

### A. Whether There was a Seizure and Whether Williams' Use of Force Was Objectively Reasonable

The parties jump right into the excessive force argument, disputing whether Miller has produced any material facts at all to support a claim that Williams used unreasonable force in stopping Miller. Although the amended complaint alleges that Williams' SUV "rammed into" Miller, causing his accident and injuries [DE 33 at 3], Miller clearly backs off of that allegation during his deposition. There, Miller conceded that he did not remember how the accident occurred, or how he received his injuries, and he was just guessing that the police vehicle actually came into contact with his bike. [Miller Dep. at 56-58, 85-86, 89-90.]

The Fourth Amendment protects against unreasonable searches and seizures, and limits the amount of force that law enforcement may use during an arrest. *See Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). Excessive force claims are analyzed

6

under an "objective reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 395-97 (1989); *see also United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017) ("When an officer is accused of using excessive force, the decisive question is whether the officer's conduct meets the Fourth Amendment's objective standard of reasonableness.").

To begin with, in any excessive force case, there is a predicate question of whether there was a seizure under the Fourth Amendment. That involves asking whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original) (finding complaint sufficiently alleged a "seizure" where the police established a roadblock crossing both lanes of the highway to stop a fleeing motorist and succeeded, and whether the act was intentional and unreasonable is an objective inquiry, *i.e.*, would a reasonable officer have believed that means used would have caused the suspect to stop); *see also Scott v. Harris*, 550 U.S. 372 (2007) (evidence that officer intentionally rammed a motorist to stop the car chase is a seizure).

In this case, there simply is no evidence that Williams terminated Miller's freedom of movement by an intentional action of ramming him with the SUV. Recall that Miller did not testify that he was rammed by the SUV; he just couldn't remember one way or the other. In other words, Miller has failed to put forth any evidence that he was seized. I'm well aware that the Seventh Circuit has warned that granting summary

judgment as a matter of law in excessive force cases should be done "sparingly," *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), as "[s]ummary judgment is often inappropriate in excessive forces cases" because "parties typically tell different stories about what happened." *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009). But in this case, there really are no conflicting stories about what happened because Miller was unconscious for most of the event. Miller testified in his deposition that he noticed the car following him, heard them yell his name, he was "freaking out," and so he "took off." [Miller Dep. at 41.] He concedes that a man got out of the car and was "chasing" him on foot. [*Id.* at 42-43.] Miller specifically admits that after he put his hand on the SUV, the next thing he remembers is waking up in the hospital. He does not recall how the injury occurred or if any collision actually happened between his bicycle and the car. [Miller Dep. at 55-58.] I have to agree with the Defendants that Miller has not put forth any evidence tending to show that Williams intentionally rammed into his bicycle. Consequently, there is no evidence that Miller was "seized."

Miller bears the burden of proof that Williams used excessive force. *Rice v. Burks*, 999 F.2d 1172, 1174-75 (7th Cir. 1993). But unsupported speculation does not survive summary judgment. *See, e.g., Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) ("While we must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture"); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014)

("Speculation is no substitute for evidence at the summary judgment stage"); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (noting "[i]nferences relying on mere speculation or conjecture will not suffice").

In his opposition memorandum, Miller argues that because Williams drove his vehicle so close to his bicycle to cause him to reach out his hand and grab the car, this "evinces a use of excessive and unreasonable force similar to the facts alleged in [the amended] complaint." [DE 57 at 7.] But, even taking Miller's account as true, just because he grabbed onto the police car's fender does not necessarily mean that Williams must have used unreasonable force, nor does it mean that the SUV must have rammed him off of the road. Indeed, the evidence is to the contrary. The officers all testified that Miller turned into the curb and it was that action which led to the fall. Moreover, although Miller reasons that because the back wheel of his bicycle was bent, there must have been some contact with the SUV, I have studied the pictures of the bicycle, and the back wheel is only slightly bent. [DE 55-6.] The bike wheel certainly is not mangled enough to create an inference that the police vehicle *must* have rammed into it. And the photos aren't inconsistent with the officers' account that Miller struck the curb and then went flying into the concrete — such an event might result in a slight bend of the back bicycle wheel.

What's more, in determining whether the force is excessive, "[a] police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the

arrest.'" *Payne*, 337 F.3d at 778 (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)). "The inquiry is fact specific and balances the intrusion on the individual against the governmental interests at stake." *Payne*, 337 F.3d at 778. The test is not "capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). As the Supreme Court noted in *Graham*, 490 U.S. at 396-97, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."

To judge the reasonableness of any use of force, I should consider facts such as (1) the severity of the crime; (2) whether the arrestee poses an immediate threat to the safety of the officers or others; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (quoting *Graham*, 490 U.S. at 396). Regarding the first factor, the crime was not extremely severe, but Miller was suspected of dealing drugs which is serious. In looking at the second factor, Miller was on a bicycle which seems to lessen the threat he posed to others, but nevertheless, he was involved in a chase. Williams testified that at one point during the chase, Miller was "driving down the middle of the road on Monroe Street on his bicycle and cars are having to dodge him." [Williams Dep. at 26.] The third factor of the *Graham* test does weigh in favor of the Defendants. Although Miller claims he did not know the people chasing him were police, Miller concedes he

was actively fleeing and leading the cars on a chase. [Miller Dep. at 26, 42-43, 46.] It seems entirely reasonable under the circumstances for Williams to drive around Miller, to get in front of him to head him off. Plaintiff has not pointed me to any case law whatsoever in support of the proposition that creating a danger that ultimately leads to an injury during an active chase could constitute excessive force.

In his opposition memorandum, Miller suggests that the officers did not have reasonable suspicion to stop him in the first place. [DE 57 at 6-7.] However, no such claims were made in the amended complaint, which clearly states that Miller's constitutional rights were violated "by using excessive and unreasonable force in arresting Plaintiff." [DE 33 at 4.] As the Seventh Circuit has noted, an opposition to a motion for summary judgment is not the time to amend pleadings or introduce new theories of liability. *Colbert v. City of Chicago*, 851 F.3d 649, 658-59 (7th Cir. 2017). Moreover, Miller does not provide any facts to oppose Williams' testimony that they received a confidential tip that Miller was a suspected drug dealer or that the building at 501 Maple Street was also a location with suspected drug activity. And again, even taking Miller's account as true (that the SUV came close enough to him for Miller to put his hand on the fender), Miller has not given me any facts that support the proposition that driving that close to Williams was a use of excessive and unreasonable force. Consequently, summary judgment is warranted on this claim.

Before moving on to the qualified immunity analysis, I want to address Count IV of the amended complaint, which requests attorneys fees under 42 U.S.C. § 1988 for the

section 1983 violation. Because I have found there is no evidence of excessive or unreasonable force, the claim for attorneys fees similarly fails.

**B.      Whether Williams is Entitled to Qualified Immunity**

I've already decided that the jury is never going to receive the issue of whether or not Williams' use of force was objectively reasonable under the circumstances. But even if this issue were to survive summary judgment, Williams would be entitled to qualified immunity.

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted). Given that part of the qualified immunity analysis rests on whether or not Williams'

actions were objectively reasonable, which I already answered as a matter of law, there is an overlap in this qualified immunity analysis.

Evaluating whether a right is clearly established "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quotation marks omitted and citation omitted). Because qualified immunity provides "ample room for mistaken judgments," the plaintiff bears the burden of demonstrating that it should not apply. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (quotation marks omitted).

A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). As I mentioned before, Miller hasn't pointed to any analogous case showing that if the police create some type of danger during a pursuit (but there isn't any evidence that an officer or vehicle ever actually came in contact with the fleeing suspect), that such an action could constitute excessive or unreasonable force. Moreover, this just wasn't egregious police conduct. Williams was following Miller's bicycle in his vehicle at a very low speed, and intended to drive around Miller to get in front of him so he could jump out of the car and apprehend Miller. Miller was a suspected narcotics dealer who

was evading the officers, and Williams' actions seem entirely reasonable under the circumstances, even taking Miller's account as true that the police vehicle came close enough to Miller that he could reach out and touch it. There certainly is no evidence that Williams intentionally violated Miller's rights by purposefully ramming into his vehicle. As such, Williams would be entitled to qualified immunity.

### C. Claims Against the La Porte County Sheriff's Department

Count III alleges that the La Porte County Sheriff's Department acted with reckless and callous disregard for the rights of individuals and "encouraged Defendant officers to violate Plaintiff's aforementioned rights by ignoring their proclivity toward violating citizen's rights by the use of excessive and unreasonable force." [DE 33 at 5.] Defendants attach the affidavit of the Sheriff of La Porte County, John Boyd, who attests that he does not allow or encourage his deputies to violate or ignore the constitutional rights of citizens, and that the policy of the department is to review any claims of misconduct. [DE 55-10, Dec. of Sheriff John T. Boyd, at 1-2.] Therefore, Defendants claim Miller has put forth no facts to support his claims that the La Porte County Sheriff's Department denied him of any constitutional rights under section 1983.

Miller completely fails to address this argument regarding his claims against the La Porte County Sheriff's Department. A non-movant's failure to address claims in response to a motion for summary judgment waives those claims. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers Int'l Union of N.*

*America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived). Miller fails to address, much less include any legal argument about his claims against the La Porte County Sheriff's office, so these claims are waived.

Even if Miller did not waive his claims against the La Porte County Sheriff's Department, they would still fail substantively. There is no evidence that the La Porte County Sheriff's Department condoned violation of constitutional rights, was deliberately indifferent in this case, or had a custom or policy of ignoring officers' misconduct and conducting no investigations.

Although it is slightly unclear from the amended complaint what claim Miller is actually stating against the La Porte County Sheriff's Department, to the extent he is trying to establish municipal liability for Williams' actions, such claims are governed by principles the Supreme Court laid out in *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978). To support a claim against the La Porte County Sheriff's Department for the allegedly unconstitutional actions of its officers, Miller "needed to present evidence that a [city] policy, practice or custom caused a constitutional violation." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). This requires proof of "'(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority.'" *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (quoting *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002)). By failing to respond to the summary judgment

motion on this issue, Miller has failed to meet this burden in order to keep his claims against the La Porte County Sheriff's Department alive.  So the La Porte County Sheriff's Department will be granted summary judgment too.

### D.    State Law Claims

Finally, I have to decide what to do with Miller's state law claims (Count I). Miller has alleged claims for assault and negligence pursuant to the Indiana Tort Claims Act.  [DE 33 at 2-3.]  Defendants removed this case from state court on the basis of federal question jurisdiction, 28 U.S.C. § 1331.  I have now granted judgment on the federal claims and, as a result, "'may decline to exercise supplemental jurisdiction' over pendent state law claims if the court has dismissed all claims over which it has original jurisdiction." *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001) (quoting 28 U.S.C. § 1367(c)(3)).  "A decision to relinquish pendent jurisdiction before the federal claims have been tried is, as we have said, the norm, not the exception, and such a decision will be reversed only in extraordinary circumstances." *Contreras*, 237 F.3d at 766 (citation omitted). I don't see any exceptional circumstances in this case.  Thus, I decline to exercise supplemental jurisdiction over the state law claims. Those claims will be remanded to state court for adjudication.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment [DE 54] is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED as to Counts II-IV of the amended complaint and the Clerk is ORDERED to DISMISS THOSE

COUNTS WITH PREJUDICE. The Motion is DENIED as to Count I, which is

REMANDED back to the La Porte Superior Court. Finally, the Clerk is ORDERED to

CLOSE this case.

SO ORDERED.

ENTERED: December 17, 2019.

　　　　　　　　　　　　　　　 /s/　 Philip P. Simon
　　　　　　　　　　　　　　　PHILIP P. SIMON, JUDGE
　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT